**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Ch. 11 |
| | ) | |
| CALPLANT I, LLC, | ) | |
| | ) | Case No. 21-11303 (MFW) |
| Debtors. | ) | |
| | ) | (Jointly Administered) |
| | ) | |
| LANCE MILLER, LIQUIDATING | ) | |
| DIRECTOR FOR THE LIQUIDATING | ) | |
| TRUST FOR CALPLANT I, LLC | ) | Adv. No. 23-50690 (MFW) |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| INDUSTRIAL FINISHES & SYSTEMS, | ) | |
| INC. | ) | |
| | ) | |
| Defendants. | ) | Rel Adv. D.I. 29, 30, 31, 32, |
| | ) | 34, 35, 36, 37, 38, 39 |

**OPINION[1]**

Before the Court are cross motions for summary judgment
regarding a single allegedly preferential transfer of $72,978.53.
For the reasons stated below, the Court will grant the
Plaintiff's motion for summary judgment and deny the Defendant's
motion.

I.   BACKGROUND

CalPlant I, LLC (the "Debtor") developed and operated a
plant which converted rice straw (a waste product of rice

---

[1]   This Opinion constitutes the findings of fact and
conclusions of law of the Court pursuant to Rule 7052 of the
Federal Rules of Bankruptcy Procedure.

farming) into medium density fiberboard.[2]  Industrial Finishes &
Systems (the "Defendant") is a wholesale distributor who provided
supplies to the Debtor pursuant to a 2019 Consignment Agreement
(the "Agreement").[3]  Under the Agreement, the Defendant shipped
supplies to the Debtor, which the Debtor used "as needed."[4]
Title to the supplies passed to the Debtor only when it used the
supplies.[5]  The Debtor periodically transmitted usage information
to the Defendant,[6] who thereafter issued an invoice to the Debtor
for the supplies it had used.[7]  The Debtor was obligated to pay
the invoices within 30 days of receipt.[8]

On September 30, 2021, the Defendant issued an invoice to
the Debtor for $72,978.53 (the "Invoice").[9]  The Debtor initiated

---

[2]    D.I. 6 ¶ 5.  References to the docket in this adversary
proceeding are to "Adv. D.I. #."  References to the docket in
Case No. 21-11302 are to "D.I. #."  Case No. 21-11302 was the
first case filed of the jointly administered Debtors in this
case.  That case was closed on October 2, 2023, and the case is
now administered under Case No. 21-11303.  D.I. 792.

[3]    Adv. D.I. 34 Ex. E (Meyers Dep. 8:2-17); Adv. D.I. 32 Ex. 4
(Consignment Agreement signed October 29, 2019).

[4]    Adv. D.I. 34 Ex. D (Renzaglia Dep. 18:5-17).

[5]    Adv. D.I. 32 Ex. 4 ¶ 5.

[6]    Adv. D.I. 34 Ex. D (Renzaglia Dep. 55:19-25, 56:1-22).

[7]    Id. 11:19-21.

[8]    Adv. D.I. 32 Ex. 4 ¶ 4.  Adv. D.I. 34 Ex. D (Renzaglia Dep.
52:5-8).

[9]    Adv. D.I. 34 Ex. E (Meyers Dep. 61:14-25, 62:1-3); Adv. D.I.
32 Ex. 13 at 23.

an electronic funds transfer ("EFT") of $72,978.53 (the "Transfer") on that same date.[10]  The Defendant's bank received the funds on October 1, 2021, and the Defendant recorded the Transfer in its records on October 4, 2021.[11]

Because of difficulties with contractors, its manufacturing process, and COVID-19, the Debtor filed a chapter 11 bankruptcy petition on October 5, 2021 (the "Petition Date").[12]  On April 15, 2023, the Court confirmed the Debtor's liquidating plan which vested all causes of action in the Liquidating Trust.[13]

The Director of the Trust (the "Plaintiff") filed this adversary proceeding on October 4, 2023, to avoid and recover certain transfers it had made pre-petition to the Defendant.[14] Count I alleges that the transfers are avoidable under section 547(b).[15]  In Count III, the Plaintiff seeks to recover the transfers under section 550(a).[16]

---

[10]    Adv. D.I. 35 Exs. A & B (June Affs. ¶ 12).

[11]    Id.  Although there is a dispute as to the exact date of the Transfer, there is no dispute that it is within the 90 days before the Petition Date.  See infra notes 59-61 and accompanying text.

[12]    D.I. 1, D.I. 6 at ¶ .

[13]    D.I. 745 ¶¶ 20-22; D.I. 726 Art. 2 § 10, Art. IX G.  See also D.I. 737 Ex. C  Art. 1 § 1.2(a).

[14]    Adv. D.I. 1.

[15]    Id. ¶¶ 31-40.

[16]    Id. ¶¶ 44-47.  Apparently, the Plaintiff has consented to dismiss Counts II and IV of the Complaint, which sought to avoid

The Defendant filed an answer denying the allegations in the complaint and raising several defenses, including that the transfers were contemporaneous exchanges for new value or were made in the ordinary course of business.[17]  The parties filed cross motions for summary judgment on Counts I and III with respect to the Transfer at issue here.[18]  Briefing is complete and the matter is ripe for decision.[19]

II.  JURISDICTION

The Court has subject matter jurisdiction over this adversary proceeding.[20]  This action is a core proceeding.[21]  Both parties have consented to entry of a final order or judgment by this Court.[22]

---

the transfers as fraudulent under section 548 and to disallow all of the Defendants' claims until the value of any avoided transfer was repaid.  Id. ¶¶ 41-43, 48-52; Adv. D.I. 30 at 13.

[17]   Adv. D.I. 18 at 7-9.

[18]   Adv. D.I. 29, 31.

[19]   Adv. D.I. 38, 39.

[20]   28 U.S.C. §§ 1334(b) & 157a.

[21]   Id. § 157(b)(2)(F).

[22]   Adv. D.I. 1 ¶ 7; Adv. D.I. 18 ¶ 7.  See Wellness Int'l Network, Ltd. v. Sharif, 575 U.S. 665, 683-84 (2015) (holding that a bankruptcy court may enter a final order without offending Article III if the parties consent).

III. <u>STANDARD OF REVIEW</u>

A.   <u>Summary Judgment</u>

The court should grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[23]  The movant bears the initial burden of proving that it is entitled to relief and that there is no genuine dispute of material fact,[24] with the court viewing the record in the light most favorable to the non-moving party.[25]  A fact is material when, under applicable substantive law, it "might affect the outcome of the suit."[26]  A dispute over a material fact is genuine when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[27]

When the movant has met its burden, the non-moving party must show more than "some metaphysical doubt as to the material facts."[28]  Where a court ultimately finds that there is no genuine dispute of material fact, it may enter a judgment as a matter of law, either for or against the movant, in full or in

---

[23]   Fed. R. Civ. P. 56(a).

[24]   <u>Celotex Corp. v. Cartrett</u>, 477 U.S. 317, 323 (1986).

[25]   <u>United States v. Diebold, Inc.</u>, 369 U.S. 654, 655 (1962).

[26]   <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).

[27]   <u>Id.</u>

[28]   <u>Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986).

part, applying the applicable substantive law.[29]


IV.   DISCUSSION

   A.   Preferential Transfers

   The core dispute in this case is whether the Transfer is a
preference pursuant to section 547 and, if it is, whether there
are any defenses to its avoidance.

      1.   Elements of a Preference

   A pre-petition transfer of a debtor's interest in property
is avoidable as a preference under section 547(b) if the transfer
was:

      (1) to or for the benefit of a creditor;
      (2) for or on account of an antecedent debt owed by the
      debtor before such transfer was made;
      (3) made while the debtor was insolvent;
      (4) made –
          (A) on or within 90 days before the date of
          the filing of the petition; . . .
      (5) that enables such creditor to receive more than
      such creditor would receive if –
          (A) the case were a case under chapter 7 of
          this title;
          (B) the transfer had not been made; and
          (C) such creditor received payments of such
          debt to the extent provided by the provisions
          of this title.[30]

   The Plaintiff has the burden of proving by a preponderance
of the evidence the elements of a preference.[31]   The Plaintiff

_____

[29]   Fed. R. Civ. P. 56 (a), (f).

[30]   11 U.S.C. § 547(b).

[31]   Id. § 547(g) ("For the purposes of this section, the trustee
has the burden of proving the avoidability of a transfer under

6

relies on the Defendant's Responses to its First Set of Requests for Admission to the Defendant (the "Defendant's Admissions") to show that the Defendant admitted (i) that the Debtor is entitled to the statutory presumption of insolvency within the 90 days before it filed bankruptcy[32] and (ii) that the Defendant received more than it would have received in chapter 7.[33]  Neither party disputes that the Transfer was made within 90 days before the Petition Date.[34]  Thus, the only elements of the Plaintiff's prima facie case that are in dispute are (i) whether the Defendant was a creditor at the time of the Transfer and (ii) whether the Transfer was made for an antecedent debt.

       2.    <u>Disputed Elements of the Preference Claim</u>

The Plaintiff asserts that the Defendant has admitted that (i) it was a creditor and (ii) the Transfer was paid on account

---

subsection (b)of this section. . . ."). <u>See also</u> <u>FBI Wind Down, Inc. v. Careers USA (In re FBI Wind Down, Inc.)</u>, 614 B.R. 460, 474 (Bankr. D. Del. 2020) (stating that the plaintiff has the burden of proving by a preponderance of evidence all of the elements of a preferential transfer claim).

[32]    Adv. D.I. 30 Ex. A ¶ 5 ("Admitted only that there is a statutory presumption of insolvency . . . ."). <u>See also</u> 11 U.S.C. § 547(f) ("For the purposes of this section, the debtor is presumed to have been insolvent on and during the 90 days immediately preceding the date of the filing of the petition.").

[33]    Adv. D.I. 30 Ex. A ¶ 6 ("Admitted [that the Transfer] . . . enabled the Defendant to receive more than the Defendant would have received (i) in a Chapter 7 liquidation under the Bankruptcy Code; (ii) had the payments not been made; and (iii) had the Defendant received payments of such debt pursuant to the provisions of the Bankruptcy Code.").

[34]    <u>See</u> <u>supra</u> notes 9-12 and accompanying text.

7

of an antecedent debt represented by the Invoice.  He first
contends that the Defendant's Admissions include facts evidencing
that the Transfer was on account of an antecedent debt.[35]  The
Plaintiff further cites the deposition testimony of the
Defendant's Senior Vice President, Daniel Meyers, who stated that
product was sold to the Debtor on a consignment basis, stored at
the Debtor's plant, and billed as the Debtor used it.[36]  The
Plaintiff also relies on the deposition testimony of the
Defendant's General Manager, Daniel Renzaglia, stating that the
Defendant generated the Invoice for $72,978.53 on September 30
because it received a report from the Debtor that the Debtor had
used the Defendant's products throughout September, as reflected
on the Invoice.[37]  The Plaintiff argues that the Agreement's
consignment label does not change the fact that when the Invoice
was issued, the Defendant had a right to payment from the Debtor
for the product it had used.  Therefore, the Plaintiff contends
that the Defendant was a creditor at the time the Debtor paid
that Invoice.

In the Defendant's Motion for Summary Judgment, the
Defendant disputes the Plaintiff's assertion that it was a
creditor.  In support, it relies on post-deposition affidavits

---

[35]    Adv. D.I. 30 Ex. A ¶ 4.

[36]    Adv. D.I. 34 Ex. E (Meyers Dep. 18:5-14).

[37]    Adv. D.I. 34 Ex. D (Renzaglia Dep. 55:24-25, 56:1-22).

from Meyers and Renzaglia (the "May Affidavits").[38]  In the May
Affidavits, both state that the Defendant was not a creditor of
the Debtor as of September 30, 2021, because the Debtor only owed
the Defendant money when the Debtor used the supplies, the
product was inventoried, the Defendant received an electronic
report, and the Defendant issued an invoice.[39]  According to the
May Affidavits, that process "had not happened by September 30"
when the Defendant issued the Invoice.[40]  They also contend that
the Defendant was not a creditor because it did not file a proof
of claim in this case.[41]

        Subsequent to the May Affidavits, the Defendant filed a
second set of Affidavits from Renzaglia and Meyers dated June 12,
2025, to "clarify" their prior statements.[42]  In the June
Affidavits, both state that they believe that the Transfer
occurred on September 30, 2021, when the Debtor initiated the
EFT, not when the Defendant's bank received those funds on
October 1, 2021, or when the Defendant recorded that payment in
its records on October 4, 2021.[43]  They assert, apparently

---

[38]     Adv. D.I. 32 Exs. 1 & 2).

[39]     Id. ¶ 7.

[40]     Id.

[41]     Id.

[42]     Adv. D.I. 35 at 5.

[43]     Adv. D.I. 35 Exs. A & B (June Affs. ¶¶ 6-12).

because the Defendant's Invoice was issued on the same day the
Transfer was made, that the Plaintiff has not established that
the Defendant was a creditor at the time of the Transfer.[44]

The Court finds that the Plaintiff's argument that the
Defendant admitted it was a creditor and that the Transfer paid
an antecedent debt is incorrect.[45]  However, the Court agrees
with the Plaintiff that the deposition testimony of both of the
Defendant's representatives establishes that the Defendant was a
creditor and the Transfer was a payment for product used by the
Debtor before the date of the Transfer.[46]

---

[44]    Id. at ¶ 6, 12.

[45]    In the Defendant's Admissions, it admits that other
transfers were for an antecedent debt but does not admit that the
Transfer was for an antecedent debt.  Adv. D.I. 30 Ex. A ¶ 4.
("Admitted, except that . . . the $72,978.53 payment, which
Plaintiff claims was made on 9/30/21 does not match up with the
Defendant's accounting records and is matched with an invoice of
the same date – which may be a typo or a mistake. . . .")
(emphasis added).

[46]    Adv. D.I. 34 Ex. E (Meyers Dep. 18:5-14) ("We would have
consigned product at that plant so there is physical product
that's there on the floor of that plant and then typically
monthly we would - someone from that plant or one of our sales
people would count the product that was there on the floor.  At
that time we would compare that against what we had consigned
there and anything that was missing we assumed had been used and
then we would create an invoice at that time for the product that
was used."); Adv. D.I. 34 Ex. D (Renzaglia Dep. 55:24-25, 56:1-
22)  ("[Plaintiff's counsel]: I just want to make sure I have it
clear.  On Exhibit A to the complaint, that $72,000 payment we're
talking about?  Mr. Renzaglia:  Okay.  [Plaintiff's counsel]: So
presumably someone at CalPlant called someone at Industrial
Finishes and said, we have used this much product and we want to
pay it just like they would have any other time.  Is that what
you are saying?  Mr. Renzaglia:  Yes.  It could have happened
that way or my salesperson could have been down there and counted

The Court also concludes that the statements of the Defendants in the May Affidavits are not credible evidence that the Defendant was not a creditor of the Debtors as of September 30, 2021. First, the Bankruptcy Code does not limit creditor status to those who file a proof of claim.[47] Second, the May Affidavits contain only one conclusory paragraph that the Defendant was not a creditor as of September 30, 2021,[48] which

---

with them together. And that was just a normal business cycle and that's what they counted and that's what we invoiced. [Defendant's counsel]: For clarity, the reality is you just don't know as a fact? Mr. Renzaglia: Yeah, we do. That is a fact. [Defendant's counsel]: Oh, you know? Mr. Renzaglia: We know that we counted that and we know that we got that information from them. Either [the Defendant's representative] was down there or [the Debtor] counted it and sent it to us. [Defendant's counsel]: Okay. Maybe I misunderstood. In this specific instance . . . I thought you said something about speculating. Mr. Renzaglia: No. I never speculated on that one. The only thing that was . . . in question was the payment was a little bit earlier than normal.").

[47]   See 11 U.S.C. §§ 101(5)(A) & 101(10)(A).

[48]   Adv. D.I. 32 Exs. 1 & 2 (May Affs. ¶ 7) ("Based on my/our review of the above, I believe that on 9/30/21 [the Defendant] was not a creditor of the Debtors, in that it had no claim against them or right to payment from them before that day. [The Defendant] did not file a Proof of Claim in the bankruptcy case. [The Defendant] stored its product at the Debtors' location (the "Floor") on consignment. Under our contract and our business relationship, we agreed the Debtor would owe us money when (a) they used our product, (b) someone from [the Defendant] and/or the Debtors later inventoried the remaining product left on the Floor, (c) we received a written or electronic report of that usage, then (d) we issued the Debtors an invoice. This had not happened by 9/30/21."). There is no indication in the Affidavits which of the requirements had not occurred as of September 30, 2021.

directly conflicts with their deposition testimony.[49]  Third, in
the discussion of the Defendant's defenses in the June
Affidavits, both Meyers and Renzaglia state that, in fact, the
Debtor had used product supplied by the Defendant in September
and had reported its usage to the Defendant, prior to the
Defendant issuing the Invoice and receiving the Transfer.[50]
Thus, the June Affidavits are consistent with the Deposition
testimony of both Meyers and Renzaglia and directly contradict
the May Affidavits.  Thus, the Court finds that the record
contains no support for the May Affidavits' bald statement that
the Defendant was not a creditor on September 30.  As a result,
the Court gives that statement no weight.[51]

The Defendant appears to argue nonetheless that the
Defendant was not a creditor of the Debtor because it has not
filed a proof of claim in this case and it had no right to

---

[49]    See supra note 46.

[50]    Adv. D.I. 35 Exs. A & B ¶ 30 (June Affidavits) ("Since the
Transfer was 9/30/21 – this means that during September the
Debtors once again used [the Defendant]'s product and same was
reported to us, resulting (again) in an invoice.  Indeed, the
invoice – which is Exhibit 14 to [the Defendant]'s Motion for
Summary Judgment . . . (a) shows in great detail what products
the Debtor put into use and (b) states that the 'Order Date' for
those products in [sic] 9/29/21 – or 1 day before the invoice and
Transfer.").

[51]    See Jiminez v. All Am. Rathskeller, Inc., 503 F.3d 247, 254-
55 (3d Cir. 2007) (holding that the district court properly
disregarded a subsequent affidavit from a deponent because the
affidavit contradicted his deposition testimony and had no other
evidentiary support in the record).

payment under the Agreement until it issued an invoice.  It asserts that the Plaintiff has not proven that the Invoice was sent before the Transfer was made.  Because the burden is on the Plaintiff to establish all the elements of a preference, the Defendant contends that it is entitled to summary judgment.

The Court rejects the Defendant's argument for two reasons. The Bankruptcy Code, not the existence of an invoice, determines an entity's status as a creditor.  The Code defines a creditor as an "entity that has a claim against the debtor that arose at the time of or before the order for relief concerning the debtor."[52] The Code defines a claim as a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured."[53]  "Under this broad definition of claim, 'all legal obligations of the debtor, no matter how remote or contingent, will be able to be dealt with in the bankruptcy case.'"[54]  While the Code does not define "antecedent debt," it does define "debt" as a "liability on a claim."[55]  While the Bankruptcy Code does not define

---

[52]    11 U.S.C. § 101(10)(A).

[53]    Id. § 101(5)(A).

[54]    U.S. Tr. v. First Jersey Sec., Inc. (In re First Jersey Sec., Inc.), 180 F.3d 504, 511 (3d Cir. 1999) (quoting Senate Report at 22, 1978 U.S. Code Cong. & Admin. News 5787, 5808.).

[55]    11 U.S.C. § 101(12).

"antecedent," its meaning is well-established: "earlier; preexisting; previous."[56]  Thus, the Court concludes that a transfer is made on account of an antecedent debt if the creditor had a right to payment of that debt <u>before</u> the debtor made the transfer.[57]  Consequently, the Court rejects the Defendant's contention that an invoice is a necessary prerequisite to an antecedent debt or status as a creditor.[58]

Further, the Defendant's own evidence shows that the Transfer was a payment for an antecedent debt.  Both Meyers and Renzaglia, in their deposition testimony and June Affidavits, admit that the Debtor used their product during the month of September.[59]  The definition of "claim" in the Code includes a "contingent" right to payment.[60]  Therefore, while the Defendant's right to payment might have been contingent on the Debtor issuing an invoice, the Court concludes that a claim arose at the time the Debtor used the Defendant's products in the

---

[56]   <u>Antecedent</u>, Black's Law Dictionary (12th ed. 2024).

[57]   <u>First Jersey Sec.</u>, 180 F.3d at 510-11 (holding that a transfer of stock for legal services already performed was a payment on account of an antecedent debt for purposes of a preferential transfer and it was not necessary that a final invoice be sent or that the bill be overdue).

[58]   <u>Id.</u> at 511 ("We agree with our sister circuits and other courts that legal claims arise when the legal services are performed, not when the bill itself is presented to the client.") (citations omitted).

[59]   <u>See</u> <u>supra</u> notes 46 & 50.

[60]   11 U.S.C. § 101(5)(A).

14

operation of its business.  The usage in September preceded the
Transfer date (regardless of whether the Transfer occurred on
September 30 when the Debtor initiated the EFT, on October 1 when
the Defendant received the funds, or on October 4 when the
Defendant recorded the funds in its books).  Therefore, the Court
concludes that there is no material dispute of fact that the
Defendant was a creditor of the Debtor and that the Transfer was
made on account of an antecedent debt on September 30, 2021.[61]

Because the Transfer was made to a creditor on account of an
antecedent debt, and the parties do not dispute the other
elements of a preferential transfer, the Court concludes that the
Plaintiff has met his burden of establishing a prima facie case
that the Transfer was a preferential transfer.

B.   Defenses to Preferential Transfers

Even if a transfer meets the criteria for a preference under
section 547(b), however, it may not be avoided if the defendant
can establish any of the available defenses under section 547(c)

---

[61]   The Court finds that the Transfer occurred on September 30,
2021, because that is the date that the Debtor relinquished
control of the funds by initiating the EFT.  See, e.g., FBI Wind
Down, 614 B.R. at 479-480 (holding that for § 547(b) purposes, a
transfer occurs when the property is "no longer under the control
of the debtor.").  The Defendant does not dispute that the
Transfer occurred on that date.  Adv. D.I. 35 Exs. A & B (June
Affs. ¶ 12) ("This means, then, that the Transfer was made on
9/30/21, not 10/1/21 – which is instead the date bank processing
of the Transfer was completed – and it was not 10/4/21.")
(emphasis in original).

of the Code.[62]  In this case, the Defendant raises the
contemporaneous exchange for new value and the ordinary course of
business defenses.[63]  The burden of proof is on the Defendant to
establish it is entitled to the benefit of those defenses.[64]

### 1.  Contemporaneous Exchange for New Value

To shield a transfer as a contemporaneous exchange for new
value, the creditor must show that (i) the debtor and the
creditor intended the transfer to be a contemporaneous exchange,
(ii) it was given for new value, and (iii) the transfer was
"substantially contemporaneous."[65]  Congress enacted this defense
to protect creditors who provide new value to distressed debtors
without diminishing the bankruptcy estate.[66]

---

[62]  11 U.S.C. § 547(c).

[63]  Id. at § 547(c)(1) & (c)(2).

[64]  Id. at § 547(g) ("[T]he creditor . . . against whom recovery
or avoidance is sought has the burden of proving the
nonavoidability of a transfer under subsection (c) of this
section."). See also First Jersey Sec., 180 F.3d at 512 (stating
that the creditor must satisfy this burden by a preponderance of
the evidence).

[65]  11 U.S.C. § 547(c)(1).

[66]  See Campbell v. Hanover Ins. Co. (In re ESA Envtl.
Specialists, Inc.), 709 F.3d 388, 397-98 (4th Cir. 2013)
("Congress 'intended § 547(c)(1) to encourage creditors to
continue to deal with troubled debtors' by 'prevent[ing] trustees
from avoiding payments that were clearly intended to support a
new transaction, instead of an antecedent debt.'"); Anderson-
Smith Assocs. v. Xyplex, Inc. (Matter of Anderson-Smith &
Assocs., Inc.), 188 B.R. 679, 688 (Bankr. N.D. Ala. 1995)
(collecting cases that hold that the contemporaneous exchange for
new value defense protects transactions that do not deplete the
estate).

The Bankruptcy Code defines new value as, _inter alia_, "money's worth in goods . . . or new credit."[67]  It is not enough that some new value was given; the creditor must prove the exact amount of new value that the debtor received in exchange for the transfer.[68]  The parties must also intend that the transfer be contemporaneous or substantially contemporaneous with the new value given for it.[69]

The Defendant argues that the evidence establishes that the Transfer was a contemporary exchange, relying on the May and June Affidavits of Renzaglia and Meyers.  In the June Affidavits, Renzaglia and Meyers assert that the exchange was substantially contemporaneous because the Invoice was issued on the same day as the Transfer (September 30, 2021).[70]  They also contend that the

---

[67]    _Id._ § 547(a)(2).

[68]    _See_ _Creditors' Committee v. Spada (In re Spada)_, 903 F.2d 971, 976 (3d Cir. 1990) (holding that "Congress was clear in requiring that a party seeking the shelter of section 547(c)(1) must prove the specific measure of the new value given to the debtor in the exchange.") (citations omitted); _FBI Wind Down_, 614 B.R. at 496 (stating that section 547(c)(1) requires a defendant prove the amount of any "new value" with specificity).

[69]    _Giuliano v. RPG Mgmt. (In re NWL Holdings, Inc.)_, No. 10-53535, 2013 WL 2436667, at *6 (Bankr. D. Del. June 4, 2013) (holding that, although late, payments for insurance premiums were intended to be substantially contemporaneous exchanges for new value, i.e., future insurance coverage).

[70]    Adv. D.I. 35 Exs. A & B (June Affs. ¶¶ 29-30).  Renzaglia and Meyers also note that the Invoice states that the Order Date was September 29, 2021, which they contend is substantially contemporaneous.  _Id._  _See also_ Adv. D.I. 32 Ex. 13 at 23 (the Invoice).

parties intended the Transfer to be a contemporaneous exchange because the Debtor intentionally made the Transfer and the Defendant intentionally accepted the payment.[71]

In the May Affidavits, Renzaglia and Meyers contend that the value provided in exchange for the Transfer was the business arrangement itself which had value to the Debtor because (i) the Debtor had agreed to it, (ii) other customers of the Defendant had found it valuable, (iii) having the product on the Floor allowed the Debtor to obtain what it needed quickly rather than wait for product to be delivered (causing additional delays and costs), and (iv) the invoices itemized which products were used and their corresponding costs, providing helpful information to the Debtor.[72]

The Defendant also argues that the Transfer was a contemporaneous exchange for new value because it was an immediate payment for a debt, even though the Agreement was a credit transaction which allowed the Debtor 30 days to pay.[73]  It further asserts that the Transfer provided a benefit to the Debtor, relying on the Plaintiff's Affidavit filed in support of

---

[71]    Adv. D.I. 35 Exs. A & B (June Affs. ¶¶ 29-30).

[72]    Adv. D.I. 32 Exs. 1 & 2 (May Affs. ¶ 9).

[73]    See Hechinger Inv. Co. of Del., Inc. v. Universal Forest Prods., Inc. (In re Hechinger Inv. Co. of Delaware, Inc.), 489 F.3d 568, 575 (3d Cir. 2007) (concluding that a credit agreement is not categorically disqualified from being a contemporaneous exchange for new value).

18

his Motion for Summary Judgment which states that "[i]mmediately prior to the Petition Date, the Debtors made a concerted effort to pay off unsecured creditors, in part for strategic reasons relating to planning for the chapter 11 process."[74]    The Defendant asks the Court to infer that the Debtor did so to avoid having a creditors' committee appointed, to ensure that the Defendant and other creditors would continue to do business with it post-petition, or for "some other reason" which provided a benefit to the Debtor.

The Plaintiff argues that the Defendant has not established that the Transfer was a contemporaneous exchange for new value. He asserts that the Defendant has not proven an essential element of the defense: the amount of any new value the Debtor allegedly received in exchange for the Transfer.    Instead of providing new value for the Transfer, the Plaintiff asserts that the Transfer was paid in exchange for the supplies used by the Debtor in September, an antecedent debt.    Therefore, the Plaintiff contends that the Defendant has failed to meet its burden of proving any section 547(c)(1) defense to the preference.

The Court agrees with the Plaintiff.    First, the Defendants' assertion that the Transfer was intended by the parties to be a contemporaneous exchange rests on its contention that the parties intended that the Transfer pay the Invoice which was issued

---

[74]    Adv. D.I. 30 Ex. C (Miller Aff. ¶ 7).

contemporaneously.  However, the proper inquiry under section 547(c)(1) is whether the parties intended to make a contemporaneous transfer of the otherwise preferential payment for new value at the time of the transfer, not for an antecedent debt.[75]  The Court has already found that the Transfer was in satisfaction of an antecedent debt, which the Debtor incurred throughout September as it used the Defendant's products.[76]  Therefore, the Court concludes that the Transfer was not a contemporaneous exchange for new value provided to the Debtor.

Second, the statements in the May Affidavits do not provide any evidence of new value given by the Defendant to the Debtor at or after the Transfer.  In those Affidavits, Meyers and Renzaglia contend that the new value provided by the Transfer was the Debtor's ability to use the Defendant's previously delivered product without paying for it in advance or having to order new supplies every time they were needed.[77]  However, the Court cannot conclude that those benefits constituted "new value" because the Debtor was already entitled to those benefits as a result of the Agreement which had been in existence since 2019. The Defendant offered no new benefits at or around the time that the Transfer occurred.

---

[75]    <u>Hechinger</u>, 489 F.3d at 575.

[76]    <u>See</u> <u>supra</u> notes 59-61 and accompanying text.

[77]    Adv. D.I. 32 at Exs. 1 & 2 (May Affs. ¶ 9).

Third, the Defendant asks the Court to "infer" new value that the Debtor received for paying off the Defendant's debt early (to avoid having a creditors' committee appointed, to ensure that the Defendant and other creditors would continue to do business with the Debtor post-petition, or for "some other reason."). Unfortunately for the Defendant, there is no evidence in the record supporting any such motive.[78] Even if the Court could make such an inference, the Defendant failed to present any evidence of the specific value of the "benefit" that the Debtor received from paying off the Defendant's debt early.[79]

Fourth, the terms of the Agreement do not contemplate contemporaneous exchanges for new value. As noted by the Defendant, the Agreement was a credit agreement, allowing the Debtor to pay for the product used by it within 30 days of the issuance of an invoice. While the Defendant correctly argues that the Third Circuit held in <u>Hechinger</u> that a credit arrangement may provide new value under section 547(c)(1),[80] the

---

[78] In addition, for purposes of a preference analysis, courts typically do not consider new value provided post-petition. <u>See, e.g.</u>, <u>Friedman's Inc. v. Roth Staffing Cos. (In re Friedman's Inc.)</u>, No. 09-10161 CSS, 2011 WL 5975283, at *5 (Bankr. D. Del. Nov. 30, 2011) (fixing preference analysis on the petition date and holding that value received post-petition and the post-petition payment of that new value does not affect the preference calculation).

[79] <u>Spada</u>, 903 F.2d at 976 (concluding that the Bankruptcy Code mandates determining how much new value was given in the exchange).

[80] <u>Hechinger</u>, 489 F.3d at 575.

facts of that case are distinguishable.  In <u>Hechinger</u>, the Court concluded that a credit agreement that allowed the debtor to pay for goods when goods were shipped (typically within five days of the issuance of the invoice) could be a contemporaneous exchange for new value.[81]  Here, however, the parties already had a credit agreement in place, goods had already been received and used by the Debtor, and the Transfer was made earlier than what the Agreement required.  Thus, the Court concludes that the Transfer was not made in exchange for an agreement to provide new goods to the Debtor.

As a result, the Court concludes that the Defendant has failed to meet its burden of establishing that the Transfer was a contemporaneous exchange for new value which would provide a defense to the avoidance of the Transfer as a preference.

    2.  <u>Ordinary Course of Business</u>

"The 'ordinary course of business' defense balances debtor and creditor interests, in order to 'induce creditors to continue dealing with a distressed debtor so as to kindle its chances of survival without a costly detour through, or a humbling ending in, the sticky web of bankruptcy.'"[82]  To protect a transfer under the ordinary course of business defense, the creditor must show that the transfer paid "a debt incurred in the ordinary

---

[81]   <u>Id.</u>

[82]   <u>FBI Wind Down</u>, 614 B.R. at 486 (citations omitted).

course of business" and that the transfer was "made in the ordinary course of business or financial affairs of the debtor and the transferee; or made according to ordinary business terms."[83]  These tests are referred to as the subjective and objective tests, respectively.[84]  The creditor must show that the transfer was ordinary between the parties to pass the subjective test or ordinary for the industry to meet the objective test.[85] The Court may consider prior dealings between the parties and timing of payments in determining if the transactions at issue were ordinary.[86]  In this case, the parties do not dispute that the debt was incurred in the ordinary course of business, only whether the Transfer was made in the ordinary course of business, subjectively or objectively.

### a.   Subjective Test

Factors that courts consider in applying the subjective ordinary course of business test include: "(1) the length of time the parties engaged in the type of dealings at issue; (2) whether the subject transfers were in an amount more than usually paid; (3) whether payments at issue were tendered in a manner different from previous payments; (4) whether there appears to have been an

---

[83]    11 U.S.C. § 547(c)(2).

[84]    NWL Holdings, 2013 WL 2436667, at *7.

[85]    Id.

[86]    Id.

unusual action by the debtor or creditor to collect on or pay the debt; and (5) whether the creditor did anything to gain an advantage (such as additional security) in light of the debtor's deteriorating condition."[87]  An important factor in determining whether a payment was made within the subjective ordinary course of business is the timing of the payment.[88]

The Defendant argues that the Transfer was made in the normal course of the parties' business dealings.  It relies on the June Affidavits in which Meyers and Renzaglia state that the amount of the Transfer was similar to the amount that the Debtor typically paid each month and that the payment method (by EFT) was typical.[89]  The Defendant further contends that there is no evidence that it engaged in any unusual collection activity to cause the Debtor to pay early.[90]  Finally, the Defendant argues

---

[87]    FBI Wind Down, 614 B.R. at 487 (citations omitted).

[88]    Jacobs v. Gramercy Jewelry Mfg. Corp. (In re M. Fabrikant & Sons, Inc.), No. 06-12737 SMB, 2010 WL 4622449, at *6 (Bankr. S.D.N.Y. Nov. 4, 2010) (holding that payments made at or around the invoice date failed the subjective ordinary course of business test between the parties even though they were made in accordance with the contract terms because the debtor historically paid late) (citing 5 Collier ¶ 504.04[2][ii], at 547-55 ("Just as payments that are made after the due date may be considered out of the ordinary course, payments may likewise be out of the ordinary course of business if they are early, that is before the due date, and the defendant does not produce evidence that early payment was the norm between the parties prior to the preference period.")).

[89]    Adv. D.I. 35 Exs. A & B (June Affs. ¶¶ 17, 19); Adv. D.I. 30 Ex. B.

[90]    Adv. D.I. 35 Exs. A & B (June Affs. ¶ 20).

that the Transfer was within the usual time that the Debtor paid the Defendant as evidenced by the parties' payment history.[91] The Defendant notes that the Debtor made payments anywhere from zero to 45 days after it received an invoice from the Defendant.[92]  Because the Transfer was made zero days (according to the Defendant) or four days (according to the Plaintiff) after the Invoice issued,[93] the Defendant contends that the Transfer fell within that range.  Consequently, the Defendant argues that the Transfer was made in the ordinary course of the parties' business.

The Plaintiff argues that the Transfer was not subjectively ordinary between the parties, as evidenced by its timing.  He relies on the parties' payment history produced by the Defendant which shows that during the pre-preference period, the Debtor averaged 28 days from invoice date to payment.[94]  The Plaintiff asserts that the Transfer was made four days after the Invoice, which is clearly outside the ordinary course of business between the parties.[95]  The Plaintiff notes that the Defendant's own

---

[91]    Adv. D.I. 30 Ex. B (Payment History).

[92]    Adv. D.I. 35 Exs. A & B (June Affs. ¶ 18).

[93]    Id.

[94]    Adv. D.I. 30 Ex. B (Payment History).

[95]    The Plaintiff relies on Meyers's Deposition testimony to support his argument that the Transfer was made 4 days after the Invoice.  Adv. D.I. 34 Ex. D (Meyers Dep. 62:4-9).  However, as noted above, the Court concludes that the Transfer occurred on

witnesses admit that 23 of the 33 payments in the parties'
business relationship (including the preference period) were made
between 20-39 days.[96]

The Court finds that the evidence presented does not support
the Defendant's subjective ordinary course of business argument.
It is undisputed that during the pre-preference period the
Debtor's median time to pay was 30 days after the invoice date,
which was consistent with the parties' "net 30" terms.[97]  In the
preference period, the median time to pay was 28 days.[98]  The
only outliers to this pattern are two payments made within 11
days in the beginning of the parties' relationship, two de
minimus finance charges paid within a week, and the Transfer at

_____

September 30, the same day as the issuance of the Invoice.  See
supra note 61.  However, whether the Transfer occurred on day 0
or day 4 is not material to the Court's analysis here.

[96]    Adv. D.I. 35 Exs. A & B (June Affs. ¶ 18).

[97]    Adv. D.I. 34 Ex. D (Renzaglia Dep. 52:5-8).  See, e.g.,
Fabrikant, 2010 WL 4622449, at *3 (to determine whether a
transfer was made in the ordinary course of business, the court
compares the average time from invoice to payment during the
preference period to the average time before the preference
period).  See also FBI Wind Down, 614 B.R. at 488 (holding that
"the Court must compare the Transfers in the Preference Period to
the transfers 'made during the prior course of the parties'
relationship to determine if the transactions were sufficiently
similar.'") (citations omitted); Burtch v. Prudential Real Estate
and Relocation Serv., Inc. (In re E Liquidation, Inc.), No. 08-
13031 (MFW), 2013 WL 3778141, at *5 (Bankr. D. Del. July 17,
2013) (same).

[98]    Adv. D.I. 30 Ex. B (Payment History).  The Defendant's
Payment History includes a total of 33 transactions, but one is a
post-petition transaction, one is the Transfer itself, and two
appear to be credits, so they are excluded from the calculation.

issue, made on the Invoice date.[99]  The Defendant's
representative, Renzaglia, admitted that it was "weird" that the
Debtor paid the Invoice so early.[100]

The Defendant argues, however, that for purposes of the
subjective test the finance charges should be treated just like
the monthly charges for supplies, because they are provided for
in the contract and are not unusual.  The Court disagrees.
Typically finance charges continue to accrue until paid, giving
the customer a financial incentive to pay them quickly.  That is
not the case with invoices which have credit terms allowing the
customer to pay later without incurring any charges.  However,
because the parties did not present any evidence regarding the

---

[99]  Id.  The finance charges were $533.09 and $38.34.  Although
the Defendant also includes a payment of 0 days on the Payment
History, the Court does not include that because (i) it occurred
post-petition, (ii) it apparently was a pre-payment for product,
and (iii) there is no evidence that the Debtor had ever made such
a pre-payment before.  Adv. D.I. 34 Ex. E (Meyers Dep. 32:18-22)
("So these are payments that come in that we didn't have an
invoice or couldn't figure out how to apply this, so it would
just sit within our accounts receivable until such time as we
could figure out what to do with it."); id. (Meyers Dep. 30:17-
35:6). (". . . so we applied that [payment] on November 19,
2021.")  Adv. D.I. 34 Ex. D (Renzaglia Dep. 45:16-46:20) ("Well,
so when we – when many of these products had been sitting there
for months, so , you know, any other customer they would have
been billed directly the time you shipped them, so we work with –
and we work with many of our customers to help them, you know,
manage their inventory and everything else so we do consignment,
so we hold all the receivables - I mean, all the of the inventory
is on our books. So when they pay early or do something like
that, I guess we make an assumption that it's for product that
they used.  So we applied it against the next invoice and that's
how it worked.).

[100]  Adv. D.I. 34 Ex. D (Renzaglia Dep. 57:23-58:1).

finance charges and because they were infrequent and small, the Court finds that it does not meaningfully change the calculation: with the finance charges included, the median time to pay is 30 days.

Based on the evidence, the Court concludes that there is no dispute of material fact that the Transfer was not made within the parties' ordinary course of business because it was made on the Invoice date instead of the usual 28-30 days after the invoice date.

b.    <u>Objective Test</u>

The Third Circuit has held that the objective ordinary course of business defense "refers to the range of terms that encompasses the practices in which firms similar in some general way to the creditor in question engage, and that only dealings so idiosyncratic as to fall outside that broad range should be deemed extraordinary and therefore outside the scope" of section 547(c)(2).[101]  Among the factors courts should consider in determining the ordinary course of business in the industry, the Third Circuit mentioned (i) how the defendant interacted with other firms that it extended credit to; (ii) whether the defendant and debtor's behavior conformed to those interactions; and (iii) whether that relationship remained stable during the

---

[101]    <u>Fiber Lite Corp. v. Molded Acoustical Prods., Inc. (In re Molded Acoustical Prods., Inc.)</u>, 18 F.3d 217, 220 (3d Cir. 1994).

28

preference period.[102]

   While the factors to be considered may be broad, the party
asserting the objective ordinary course of business defense may
not rely on general assertions but "must provide admissible non-
hearsay testimony related to industry credit payment, and general
business terms in order to support its position."[103]  "Where a
defendant presents only the party's practices and gives no
general industry standards for comparison, it has not met its
burden under Section 547(c)(2)(B)."[104]

   In support of its section 547(c)(2)(B) defense, the
Defendant relies on the June Affidavits as evidence that the
Transfer was objectively within the ordinary course of business.
In those Affidavits, Meyers and Renzaglia state that they have
many years of experience in the industry and with suppliers and
customers therein.[105]  They state that the terms of the business
relationship between the Defendant and the Debtor were like those
the Defendant had with other customers.  Specifically, they state
that many of their customers have consignment agreements, pay
varying amounts depending on usage, use EFT to pay, and are

---

[102]   Id. at 227.

[103]   FBI Wind Down, 614 B.R. at 495.  See also Molded Acoustical,
18 F.3d at 228 (finding that defendant had not presented
sufficient evidence to show the transaction was objectively
ordinary).

[104]   FBI Wind Down, 614 B.R. at 495.

[105]   Adv. D.I. 35 Exs. A & B (June Affs. ¶ 24).

charged finance charges.[106]

The Plaintiff argues that the June Affidavits are insufficient evidence that the Transfer was objectively ordinary. He contends that neither Meyers nor Renzaglia are experts in the industry and that their statements are too conclusory and too general to meet the Defendant's burden of proof.

The Court agrees with the Plaintiff.  While the Defendant was not required to present expert testimony on industry practices, it could not rely simply on general statements of what its practices were or what the practices of its other customers were.[107]  Although Renzaglia and Meyers both claim to be experts with many years of experience in the industry, they offer little detail and no data to support that position.  It appears that their expertise in the industry is limited to their experience working for the Defendant.

---

[106]    Id. ¶¶ 24-28.

[107]    See, e.g., Matter of Midway Airlines, Inc., 69 F.3d 792, 797 (7th Cir. 1995) (stating that expert testimony or evidence from competitors is not necessary, but there must be a reference to external data of how competitors behave or else the goal of the objective inquiry is undermined); FBI Wind Down, 614 B.R. at 495 (holding that defendant's affidavit which stated that its practices were "customary for countless clients of [the Defendant] and are generally common throughout the industry" was insufficient to meet the standards for section 547(c)(2)(B)). But see Matter of Tolona Pizza Prods. Corp., 3 F.3d 1029, 1033 (7th Cir. 1993) (holding that the defendant's executive vice president's testimony about how many days between invoice date and payment prevailed in the wider industry was sufficient evidence to find that the preferential payments were objectively ordinary).

Further, neither testified about whether it is normal industry practice to pay an invoice on the day it is issued, or shortly thereafter, when the terms allow 30 days to pay, the exact issue that is relevant here.  Instead, they state only that it is normal industry practice to provide products on a consignment basis, that customers pay their invoices by EFT, that invoice amounts vary depending on the amount of product consumed, that finance charges are not unusual, and that net 30-day terms are normal.[108]  The Court concludes that such general conclusory statements that do not speak to the exact issue before the Court are insufficient to satisfy the Defendant's burden of proof to show that the Transfer was paid in the objective ordinary course of business.[109]

Because the Defendant has not proven that it has any defense to the preference under section 547(c), the Court finds that the Transfer is avoidable under section 547(b) of the Code and will grant judgment in favor of the Plaintiff on Count I of the Complaint as to the $72,978.53 transfer.

C.    Recovery of the Transfer

"[T]o the extent that a transfer is avoided under section .

---

[108]    Adv. D.I. 35 Exs. A & B (June Affs. ¶¶ 24-28).  See also Adv. D.I. 34 Ex. D (Renzaglia Dep. 52:5-8).

[109]    FBI Wind Down, 614 B.R. at 495 (denying the creditor's motion for summary judgment on the objective ordinary course defense because the creditor had not presented specific data supporting its argument).

. . 547 . . . the trustee may recover, for the benefit of the
estate, the . . . value of such property, from the initial
transferee of such transfer."[110]  The Court has concluded that the
Transfer is avoidable under section 547.  Therefore, the
Plaintiff is entitled to recover the value of the Transfer from
the Defendant.  Accordingly, the Court will grant judgment in
favor of the Plaintiff on Count III of the Complaint which seeks
to recover the Transfer's value under section 550(a).

V.    <u>CONCLUSION</u>

For the foregoing reasons, the Court will grant the
Plaintiff's motion for summary judgment on Counts I and III of
the Complaint as to the $72,978.53 transfer and will deny the
Defendant's motion for summary judgment.

An appropriate Order is attached.

Dated: October 27, 2025          BY THE COURT:

Mary F. Walrath
United States Bankruptcy Judge

---

[110]    11 U.S.C. § 550(a)(1).

32